# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| DAMON KEY LEONG KUPCHAK HASTERT,<br><br>Plaintiff,<br><br>vs.<br><br>WESTPORT INSURANCE CORPORATION, *et al.*,<br><br>Defendants. | Case No. 19-cv-00099-DKW-KJM<br><br>**ORDER (1) GRANTING DEFENDANTS' MOTION TO DISMISS WITHOUT LEAVE TO AMEND; AND (2) DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |

In this insurance coverage dispute, the law firm of Damon Key Leong Kupchak Hastert ("Damon Key") filed suit against its insurer, claiming that the company wrongfully denied coverage and failed to defend the law firm in an underlying proceeding where the plaintiffs sought to hold the non-party firm in contempt for allegedly violating a federal court injunction order. Defendant Westport Insurance Corporation avers that the underlying action did not present a "Claim" for "Loss" covered by the terms of the policy and accordingly has moved under Rule 12(b)(6) to dismiss the complaint. Dkt. No. 10. Firm in its position, Damon Key filed a counter motion for partial summary judgment. Dkt. No. 17.

As set forth below, the Court concludes that the unambiguous terms of the policy did not obligate Westport to defend Damon Key in the underlying action.

Westport's motion to dismiss is therefore GRANTED, and the complaint is DISMISSED with prejudice.

## FACTUAL & PROCEDURAL BACKGROUND

Because the dispute here centers on the meaning of policy terms that both parties acknowledge, the material facts set forth below are uncontested.

### A.    Terms of the Policy

Westport issued a Lawyers Professional Liability Insurance Policy (the "Policy") (Dkt. No. 1-1) to Damon Key, effective March 31, 2015 to March 31, 2016.  Dkt. No. 1, ¶ 7.  The Policy states that Westport will pay for "all LOSS . . . as a result of CLAIMS" made against Damon Key.  Dkt. No. 1-1 at 1.  The Policy further provides that Westport has "the right and duty to select counsel and arbitrators and to defend any CLAIM for LOSS" against Damon Key "even if such CLAIM is groundless, false or fraudulent . . ."  *Id.* at 8.  As defined in the Policy, a CLAIM is "a demand made upon [Damon Key] for LOSS, including . . . service of suit, or institution of arbitration proceedings or administrative proceedings," *id.* at 2, and a "LOSS" is "the monetary and compensatory portion of any judgment, award, or settlement."  *Id.* at 4.  A "LOSS," however, does not include, *inter alia*, "civil or criminal fines, penalties, fees or sanctions" or "any form of non-monetary relief."  *Id.*

### B.    The Underlying Litigation in *Takiguchi v. MRI International, Inc.*

Triggering this coverage dispute is *Takiguchi v. MRI International, Inc.*, a securities fraud class action filed in Nevada federal district court on July 5, 2013, alleging that the defendants operated a "massive Ponzi scheme." *See* 47 F. Supp. 3d 1100, 1107–08 (D. Nev. 2014); Dkt. No. 1, ¶ 15.  Among the defendants named in *Takiguchi* were certain members of the Suzuki family, including Junzo, Paul, Keiko, and Catherine Suzuki (collectively, the "Suzukis").[1]  *See* Dkt. No. 1, ¶ 16.  Since 2013, the Suzukis have been clients of Damon Key, and the law firm has held several million dollars for the Suzukis in its client trust accounts, separately accounting for each individual's funds.  *See* Dkt. No. 1, ¶¶ 17, 29.[2]  Damon Key, however, did not represent the Suzukis in the *Takiguchi* litigation, nor was Damon Key a party.  *See* Dkt. No. 15 at 2.

On September 18, 2014, the federal district court in Nevada entered an injunction order, essentially freezing the assets of the Suzukis ("Asset Freeze Order") (Dkt. No. 18-3).  Dkt. No. 1, ¶ 15.  The Asset Freeze Order specifically prohibited "Junzo Suzuki, Paul Musashi Suzuki, their agents and representatives, and all persons and entities under the control of or acting in concert with either of them" from "[d]irectly or indirectly transferring, converting, selling, . . . or otherwise

---

[1] *See* Fifth Amended Complaint, *Takiguchi*, No. 2:13-cv-01183 (D. Nev. Sept. 29, 2016), ECF No. 481.

[2] *See also* Order at 11, *Takiguchi*, No. 2:13-cv-01183 (D. Nev. Aug. 31, 2017), ECF No. 724.

disposing of any assets, wherever located . . ." Dkt. No. 18-3 at 17.[3]

### 1.    The First "Show Cause" Application Against Damon Key

On February 25, 2016, the *Takiguchi* plaintiffs filed, under seal, an "Application for Order to Show Cause Why the Suzuki Defendants and the Law Firm Damon Key . . . Should Not Be Held in Contempt" (**"First Application"**) (Dkt. No. 15).  Dkt. No. 1, ¶ 24.  As the caption implies, the *Takiguchi* plaintiffs asserted that Damon Key "defied" the Asset Freeze Order in October 2014 when the firm transferred a total of $1.75 million in Suzuki family funds to bank accounts in Japan that belonged to Keiko and Catherine Suzuki.  Dkt. No. 15 at 2–3.  In terms of relief, the plaintiffs sought an order requiring the Suzuki defendants and Damon Key to "show cause" why they should not be "adjudged in civil contempt of the orders of the court." If defendants, including Damon Key, could not, the First Application asked the federal court to "find each of them in contempt and order" Damon Key to "deliver the sum of $1.75 million into a trust account . . . to fund any judgment . . . against Junzo or Paul Suzuki" and "provide an accounting" of funds covered by the Asset Freeze Order.  Dkt. No. 15 at 1–3, 9.[4]

---

[3]Keiko and Catherine Suzuki were not named as defendants in *Takiguchi* at the time the Asset Freeze Order was instituted.  Dkt. No. 1, ¶ 16; *see* Third Amended Complaint, *Takiguchi*, (D. Nev. June 6, 2014), ECF No. 152.  When the Fifth Amended Complaint was filed, *supra* note 1, Keiko and Catherine were added as defendants.  *Cf.* Fourth Amended Complaint, *Takiguchi*, (D. Nev. Jan. 26, 2015), ECF No. 223.

[4]The First Application used the term "sanction(s)" three times in connection with supporting case law.  Dkt. No. 15 at 7–8.

On September 16, 2016, the court denied the First Application, without prejudice, because the *Takiguchi* plaintiffs had failed to submit "evidence as to the origin of the funds allegedly transferred in violation of [the Asset Freeze Order]." Dkt. No. 18-8 at 1–2; *see* Dkt. No. 1, ¶ 27.

### 2. The Second "Show Cause" Application Against Damon Key

Undeterred by the court's ruling, on January 22, 2017, the *Takiguchi* plaintiffs renewed their civil contempt motion—but only as to Damon Key—and captioned the sealed motion: "Application for Order to Show Cause Why the Law Firm Damon Key . . . Should Not Be Held in Contempt" (**"Second Application"**) (Dkt. No. 18-9 at 1, 3). Dkt. No. 1, ¶ 28. Like its predecessor, the Second Application alleged that Damon Key covertly transferred $1.75 million in Suzuki funds to overseas accounts in violation of the Asset Freeze Order. Dkt. No. 18-9 at 9. The *Takiguchi* plaintiffs requested that Damon Key "now be ordered to show cause why it should not be adjudicated in contempt." If Damon Key could not do so, the plaintiffs asked the court to "then find the firm in contempt and order" Damon Key to "pay and deliver the sum of $1,809,569 into a trust account . . . to fund any judgment . . . against the Suzuki defendants or their affiliates" and "provide an accounting" of funds covered by the Asset Freeze Order. Dkt. No. 18-9 at 3–4; Dkt. No. 1, ¶¶ 28–29.[5]

---

[5]The Second Application, like the first, used the term "sanction(s)" three times in conjunction

On August 31, 2017, the court denied the Second Application because the *Takiguchi* plaintiffs had "failed to make a sufficient evidentiary showing to justify an order to show cause." Order at 9, *Takiguchi*, No. 2:13-cv-1183 (D. Nev. Aug. 31, 2017), ECF No. 723; Dkt. No. 1, ¶ 30.

### C.    Westport Denies Coverage Under the Policy

The day after the First Application was filed, Damon Key sent a copy of the Application to Westport. Dkt. No. 1, ¶ 24. By letter dated March 29, 2016, Westport denied that it had a duty to defend or indemnify Damon Key under the Policy. Westport allegedly reasoned that because the *Takiguchi* plaintiffs sought to hold Damon Key in contempt, the matter was a request for "sanctions" expressly excluded from the definition of a "LOSS" under the Policy. *See id.* at ¶ 32. Westport accordingly informed Damon Key that it would make no further payments to Alston Hunt, the law firm Damon Key had retained for its defense of the contempt order Applications. *See id.* at ¶ 32; *see also* Dkt. Nos. 18-6 at 1; Dkt. No. 18-7 at 2.[6]

This action followed on February 27, 2019. Dkt. No. 1.

### STANDARD OF REVIEW

### I.    Rule 12(b)(6)

A complaint may be challenged for failure "to state a claim upon which relief

---

with citations to supporting authority. Dkt. No. 18-9 at 10–11.

[6]In March 2018, the parties purportedly agreed to toll the statute of limitations for a period of one year. Dkt. No. 1, ¶ 37.

can be granted." Fed.R.Civ.P. 12(b)(6). To withstand such a challenge, a complaint must contain enough facts "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); Fed.R.Civ.P. 8(a)(2). Even though a "complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citations omitted).

On a Rule 12(b)(6) motion to dismiss, a court "must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), and draw "any reasonable inferences" in favor of the plaintiff. *Johnson v. Riverside Healthcare Sys.*, 534 F.3d 1116, 1122 (9th Cir. 2008). To that end, a court must judge the sufficiency of a complaint under a two-pronged approach: (1) disregard all "legal conclusions" and "conclusory statements"; and (2) determine whether the remaining "well-pleaded factual allegations," accepted as true, "plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–81 (2009).

Accordingly, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679 (citing *Twombly*, 550 U.S. at 556). A claim becomes plausible "when the plaintiff pleads factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. That is, the plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555 (internal citations omitted). If, from the well-pleaded facts, the court cannot "infer more than the mere possibility of misconduct, the complaint has alleged—but has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting Fed.R.Civ.P. 8(a)(2)).

Although materials outside the pleadings are generally not considered in ruling on a Rule 12(b)(6) motion, a court "may consider extrinsic evidence not attached to the complaint if the document's authenticity is not contested and the plaintiff's complaint necessarily relies on it." *Johnson v. Fed. Home Loan Mortg. Corp.*, 793 F.3d 1005, 1007 (9th Cir. 2015); *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) (noting that such documents attached to a defendant's motion to dismiss may be considered, "even though the plaintiff does not explicitly allege the contents of that document in the complaint."). Where a written instrument contradicts allegations in the complaint, the former controls. *Johnson*, 793 F.3d at 1007–08; *Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008) ("[W]e need not accept as true allegations contradicting documents that are referenced in the complaint.").

## II.    Rule 56(a)

Summary judgment under Rule 56 is appropriate only when the Court, viewing the record as a whole and in the light most favorable to the nonmoving party, determines that there exists no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986).  A *genuine* issue of *material* fact exists when, "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Anderson*, 477 U.S. at 249.  "[A] complete failure of proof concerning an essential element" of a claim "necessarily renders all other facts immaterial."  *Celotex*, 477 U.S. at 323.

Where "cross-motions" are presented by the parties, the court "evaluate[s] 'each motion separately, giving the nonmoving party in each instance the benefit of all reasonable inferences.'"  *See Zabriskie v. Fannie Mae*, 912 F.3d 1192, 1196 (9th Cir. 2019) (quoting *ACLU of Nev. v. City of Las Vegas*, 466 F.3d 784, 790–91 (9th Cir. 2006)).

## **DISCUSSION**

Damon Key asserts two counts against Westport: (1) breach of the duty to defend; and (2) breach of the implied covenant of good faith and fair dealing.  Dkt.

No. 1, ¶¶ 44, 53.  Addressing each count *seriatim*, the Court concludes as a matter of law that Damon Key cannot prevail on either claim.

## I.    Whether Westport Breached Its Duty to Defend (Count I)

Damon Key asserts in Count I that the Applications qualify as "CLAIMS" for "LOSS" covered by the Policy, and therefore Westport "breached its duty to defend" when it declined to pay or reimburse the costs Damon Key incurred in defending against the Applications.  *See* Dkt. No. 1, ¶¶ 42–44.  Based on that same reasoning, Damon Key maintains that it is entitled to partial summary judgment.  *See* Dkt. No. 17-1 at 16, 18–20.  Westport, however, contends that it did not have a duty to defend Damon Key against the *Takiguchi* plaintiffs' Applications because the plaintiffs sought to impose a "sanction" on Damon Key for the alleged violation of the Asset Freeze Order, and the Policy excludes coverage for proceedings seeking, *inter alia*, "sanctions."  Dkt. No. 10-1 at 9, 12.  The issue therefore, is purely a matter of contract interpretation; namely, whether the *Takiguchi* plaintiffs' Applications were "CLAIMS" for "LOSS" covered by the Policy.

### A.    Legal Framework: Insurer's Duty to Defend

Under Hawaii insurance law,[7]  an insurer's "duty to defend 'is broader than the duty to pay claims and arises whenever there is a mere *potential* for coverage,"

---

[7]The parties agree that Hawaii insurance law governs their dispute.  *See* Dkt. No. 10-1 at 10–13, 21; Dkt. No. 17-1 at 1 n.1.

even if that "possibility may be remote." *Allstate Ins. Co. v. Pruett*, 186 P.3d 609, 623 (Haw. 2008) (emphasis in original) (quoting *Sentinel Ins. Co., Ltd. v. First Ins. Co. of Hawai'i, Ltd.*, 875 P.2d 894, 904 (1994)). Nonetheless, as the Hawaii Supreme Court has succinctly and repeatedly stated:

> [T]he duty to defend "is limited to situations where the pleadings [in the underlying case] have alleged claims for relief which fall within the terms for coverage of the insurance contract. Where pleadings fail to allege any basis for recovery within the coverage clause, the insurer has no obligation to defend."

*Pruett*, 186 P.3d at 623 (quoting *Hawaiian Holiday Macadamia Nut Co., Inc. v. Indus. Indem. Co.*, 872 P.2d 230, 233 (Haw. 1994)). The "focus" of this inquiry is on "the alleged claims and facts" in the underlying pleadings, *see Burlington Ins. Co. v. Oceanic Design & Const., Inc.*, 383 F.3d 940, 944 (9th Cir. 2004) (applying Hawaii law), as framed when the pleadings were initially filed. *Hart v. Ticor Title Ins. Co.*, 272 P.3d 1215, 1225 (Haw. 2012). "All doubts as to whether a duty to defend exists are resolved against the insurer and in favor of the insured." *Id.* (citation omitted). "[W]hen the facts alleged in the underlying complaint unambiguously exclude the possibility of coverage, conclusory assertions contained in the complaint regarding the legal significance of those facts . . . are insufficient to trigger the insurer's duty to defend." *Dairy Rd. Partners v. Island Ins. Co.*, 992 P.2d 93, 106–07 (Haw. 2000).

Because "[a]n insurer's duty to defend stems from the policy contract . . ., the language of the policy involved determines the scope of that duty." *Hart*, 272 P.3d at 1223; *C. Brewer & Co. v. Marine Indem. Ins. Co. of Am.*, 347 P.3d 163, 169 (Haw. 2015). Given that insurance policies are contracts, they "are subject to the general rules of contract construction." *Guajardo v. AIG Haw. Ins. Co.*, 187 P.3d 580, 587 (Haw. 2008) (quoting *Dairy Rd.*, 992 P.2d at 106–07). The policy is "construed according to the entirety of its terms and conditions as set forth in the policy," Haw. Rev. Stat. § 431:10-237, and the terms of the policy are "interpreted according to their plain, ordinary, and accepted sense in common speech unless it appears from the policy that a different meaning is intended." *Pruett*, 186 P.3d at 617 (citation and internal quotation marks omitted). That is, the insurance policy must be construed in "accord with the reasonable expectations of a layperson." *Hart*, 272 P.3d at 1223 (citation and internal quotation marks omitted); *Del Monte Fresh Produce, Inc. v. Fireman's Fund Ins. Co.*, 183 P.3d 734, 745 (Haw. 2007) (explaining that "[t]hese 'reasonable expectations' are derived from the insurance policy itself"). But "because insurance policies are contracts of adhesion . . . prepared by the insurer's attorneys, . . . they must be construed liberally in favor of the insured and any ambiguities must be resolved against the insurer." *Pruett*, 186 P.3d at 617 (citation and internal quotation marks omitted).

Nonetheless, the Hawaii Supreme Court has cautioned courts to "not create ambiguity where none exists." *Hart*, 272 P.3d at 1223 (citation omitted) (quoting *Smith v. New England Mut. Life Ins. Co.*, 827 P.2d 635, 638 (1992)). "A contract is ambiguous when its terms are reasonably susceptible to more than one meaning." *Hawaiian Ass'n of Seventh-Day Adventists v. Wong*, 305 P.3d 452, 461 (Haw. 2013). But the mere fact that the parties offer competing interpretations of contract terms "does not render clear language ambiguous." *State Farm Fire & Cas. Co. v. Pacific Rent-All, Inc.*, 978 P.2d 753, 762 (Haw. 1999) (collecting cases). And by the same token, a term left undefined in the contract—without more—does not constitute an ambiguity. *See, e.g.*, *Hawaiin Ass'n of Seventh-Day Adventists*, 305 P.3d at 463–64; *Hart*, 272 P.3d at 1224; *Pruett*, 186 P.3d at 619. "[T]he construction and legal effect to be given a contract is a question of law" and "whether a contract is ambiguous is likewise a question of law." *Brown v. KFC National Mgmt. Co.*, 921 P.2d 146, 159 (Haw. 1996).

**B.     Westport Had No Duty to Defend**

Based on the above legal principles, the question here is whether the facts and claims alleged in the *Takiguchi* plaintiffs' Applications, at the time they were filed, state a claim that fits within the Policy's terms of coverage. Because the Applications unambiguously sought a "sanction," which is excluded from the

meaning of "Claims" for "Loss" covered by the Policy, the Court concludes Westport had no duty to defend.

As noted above, Section I.A of the Policy establishes that the Policy covers "Claims" for "Loss" made against Damon Key (Dkt. No. 1-1 at 1), and Section V.C.1 provides that Westport has "the right and duty to," *inter alia*, "defend any CLAIM for LOSS" against Damon Key. *Id.* at 8. The terms "Claim" and "Loss" are defined separately in the Policy.

A "Claim" is defined, in relevant part under Section III.C.1, as "a demand made upon [Damon Key] for LOSS, including . . . service of suit . . ." *Id.* at 2. And Section III.K states that a "LOSS" is "the monetary and compensatory portion of any judgment, award, or settlement." *Id.* at 4. But under the same subsection, it states that a "Loss" does not include, *inter alia*, any "civil or criminal fines, penalties, fees or sanctions" or "form of non-monetary relief." *Id.* Thus, when read together, the Policy unambiguously states that Westport had no duty to defend any "demand made upon [Damon Key]" for "civil or criminal fines, penalties, fees or sanctions" or for any "form of non-monetary relief." That much is uncontested.

The parties disagree, however, as to the meaning of the term "sanctions." Westport argues the Applications in the *Takiguchi* litigation sought "sanctions" against Damon Key and, therefore, were excluded from coverage. Dkt. No. 10-1 at 13–15. In Damon Key's view, the Applications requested that the court order

Damon Key to create and seed a trust account "to fund any judgment" and, therefore, the Applications were a "Claim" for "Loss" under the Policy. Dkt. No. 17-1 at 20, 22. Given these competing interpretations, Damon Key concludes that "'sanctions' is ambiguous under the [P]olicy and, therefore, must be construed in Damon Key's favor." Dkt. No. 17-1 at 19, 27. But Damon Key's argument misses the mark.

"[T]he rule construing an ambiguity against an insurer is not applied without exception upon mere assertions of ambiguity. Rather, ambiguity is found [and the rule] is followed only when the contract taken as a whole is reasonably subject to differing interpretation." *Pruett*, 186 P.3d at 624 (internal citations and quotation marks omitted). The mere fact that "sanctions" is undefined in the contract— without more—does not constitute an ambiguity. *See, e.g.*, *Hawaiin Ass'n of Seventh-Day Adventists*, 305 P.3d at 463–64; *Hart*, 272 P.3d at 1224; *Pruett*, 186 P.3d at 619. In part, that is because "[w]here terms are undefined, the court may resort to legal or other well-accepted dictionaries to determine their ordinary meaning." *Hawaiin Ass'n of Seventh-Day Adventists*, 305 P.3d at 463.

Black's Law Dictionary is the classic legal dictionary on which courts rely. *See id.* at 462–64 (relying on *Black's* to define terms in an agreement); *Fireman's Fund Ins. Co. v. AIG Haw. Ins. Co* ., 126 P.3d 386, 395-400 (Haw. 2006) (same). *Black*'s defines a "sanction" as "[a] penalty or coercive measure that results from

failure to comply with a law, rule, **or order**."[8]  The underlying Applications fit squarely within *Black*'s definition.

First, the Applications allege that Damon Key "defied" the Asset Freeze Order by transferring $1.75 million in Suzuki family funds.  Dkt.  *See* First Application, Dkt. No. 15 at 7, 9; Second Application, Dkt. No. 18-9 at 9, 11–12 ("Damon Key deliberately and egregiously violated the injunction").  Thus, the basis for the Applications was Damon Key's alleged "failure to comply with . . . [the Nevada federal court's] order," which, by itself, renders the related proceedings to be "sanctions" proceedings within the meaning ascribed by *Black*'s.

Second, as a result of the law firm's alleged decision to knowingly violate the federal court's order, the *Takiguchi* plaintiffs requested that Damon Key be "adjudged in civil contempt of the orders of the court."  "Contempt" is "[c]onduct that defies the authority or dignity of a court or legislature."[9]  And "civil contempt," more specifically, is "[t]he failure to obey a court order that was issued for another party's benefit.  **A civil-contempt proceeding is *coercive or remedial in nature*. The *usual sanction* is to confine the contemnor until he or she complies with the**

---

[8]*Sanction*, BLACK'S LAW DICTIONARY (11th ed. 2019), *available* at Westlaw (emphasis added).  Damon Key has not proposed a precise, alternative definition for "sanction."  Instead, Damon Key has only suggested in the abstract that the term "sanctions" refers to violations of the Federal Rules of Civil Procedure or "the court's exercise of its inherent powers."  Dkt. No. 17-1 at 21.  But where that limited view comes from is not clear and, as explained below, the Policy contains no such limit on the definition of "sanctions."
[9]*Contempt* (3), BLACK'S LAW DICTIONARY (11th ed. 2019), *available* at Westlaw.

**court order.**"[10]   It follows then that the *Takiguchi* plaintiffs' initiated a civil-contempt proceeding for the alleged failure to obey a court order, which subjected Damon Key to numerous sanctions remedies at the court's disposal.

Third, the specific "penalty" or "sanction" the *Takiguchi* plaintiffs sought from Damon Key was "remedial" compensation; namely, an order requiring Damon Key to "deliver" to a trust account the precise monetary amount that Damon Key allegedly transferred in violation of the court order, with the intent being to make funds available to satisfy a possible judgment against the Suzukis.  First Application, Dkt. No. 15 at 3; Second Application, Dkt. No. 18-9 at 3.  Thus, in the Applications, there was an unambiguous "demand made upon [Damon Key]" for "sanctions," Dkt. No. 1-1 at 4, 8, as that term is defined in "its plain, ordinary, and accepted sense in common speech consistent with the reasonable expectations of a layperson." *Hart*, 272 P.3d at 1224.  Such a claim is expressly excluded from coverage under the Policy. Dkt. No. 1-1 at 4, 8.  Moreover, the Applications also sought an "accounting" of funds covered by the Asset Freeze Order (Dkt. No. 15 at 3; Dkt. No. 18-9 at 3–4), and therefore the Applications made a demand for "non-monetary relief," coverage for which is also excluded under the Policy.  Dkt. No. 1-1 at 4.  Therefore, under the plain terms of the Policy, Westport had no duty to defend.

---

[10]*Id.* (emphasis added).

Damon Key nonetheless urges the Court to focus on the "actual relief sought" and argues that "sanctions" contemplates the type of relief imposed on attorneys for violating Rules 11 or 37 of the Federal Rules of Civil Procedure, not the establishment of a trust fund.  Dkt. No. 17-1 at 21–23; *see* Dkt. No. 23 at 6.  At least two problems exist with this contention.  First, the "actual relief sought" is a red herring; *regardless* of the relief sought, the nature of the underlying proceedings involved a non-party's intentional violation of a court order.  That made the proceedings sanctions proceedings, whatever remedy the court chose to fashion. Second, there is nothing inherent in the creation of a "trust fund" that would dictate the nature of the underlying action.  A trust fund, in other words, could be part of compensatory relief awarded by the court for breaching a contract or relief awarded for any number of other reasons.  Conjuring those other reasons is a meaningless exercise because we have no need to hypothesize.  Here, we know on what conduct the *Takiguchi* plaintiffs based their Applications seeking the creation of a trust fund: Damon Key's alleged failure to adhere to the court's Asset Freeze Order.  Under that circumstance—the only one relevant to evaluating coverage under the Policy—there is no question the court convened proceedings to determine if sanctions were warranted.

Moreover, it is of no import that the *Takiguchi* plaintiffs did not "explicitly or implicitly" request "sanctions," as Damon Key contends is required.  Dkt. No. 17-1

at 30. Such a rule would place form over substance and directly contradict the manner in which the duty to defend is evaluated. *See Dairy Rd.*, 992 P.2d at 111–12 (reaffirming that "plaintiffs could not, through artful pleading, bootstrap the availability of insurance coverage under an insured defendant's policy by purporting to state a claim for negligence based on facts that, in reality, reflected manifestly intentional, rather than negligent, conduct."). But even if that were the rule, *each* Application *did* reference "sanction(s)" three times. *See* First Application, Dkt. No. 15 at 7–8; Second Application, Dkt. No. 18-9 at 10–11. While the references related to case citations, rather than to an express demand, no stretch is necessary to conclude that cases referencing sanctions were offered because of what the underlying plaintiffs were seeking.

Citing *Sentinel*, 875 P.2d at 907, Damon Key additionally asserts that the meaning of the word "sanctions" must be ambiguous because "Hawaii courts have never addressed the specific issue in this case, *i.e.*, whether [in a civil-contempt proceeding] ordering a party to create a trust fund to secure a possible judgment is a 'sanction'" and thus it was "possible" that coverage existed, requiring Westport to defend. Dkt. No. 17-1 at 29–30; Dkt. No. 23 at 11–12. But the Ninth Circuit has rejected the exact "legal ambiguity" argument that Damon Key now raises. *Burlington*, 383 F.3d at 953 ("*Sentinel* does not stand for the proposition that the

absence of controlling Hawaii case law" is itself "sufficient legal uncertainty to trigger coverage.").[11]

Of further note, the cases Damon Key relies on to reach its preferred outcome did not involve contempt proceedings against a non-party for the alleged violation of an injunction. *Carey v. Employers Mut. Cas. Co.*, 189 F.3d 414, 416–17 (3d Cir. 1999) (claim for surcharge fees); In re *Estate of Corriea*, 719 A.2d 1234, 1235 (D.C. 1998) (action against attorney for breach of fiduciary duty); Dkt. No. 17-1 at 25–26. That distinction is important because, as noted above, a civil-contempt proceeding inherently involves a request for sanctions. And unlike with generic tort and contract claims of the type at issue in Damon Key's cases, there are few (if any) defenses available to a defendant in a civil-contempt proceeding. *Perry v. O'Donnell*, 759 F.2d 702, 705 (9th Cir. 1985) ("[C]ivil contempt may be established even though the failure to comply with the court order was unintentional."); *Donovan v. Mazzola*, 716 F.2d 1226, 1240 (9th Cir. 1983) ("The sole question is whether a party complied with the district court's order."), *cert.denied*, 464 U.S. 1040 (1984). Understandably then, a civil-contempt proceeding is one action an insurer would prefer to avoid

---

[11] *Sentinel* is properly understood as being limited to situations where there is "a notable dispute nationwide" and "significant conflict among jurisdictions" as to the issue presented. *Id.* (quoting *Sentinel*, 875 P.2d at 907). As the court held in *Burlington*, a holding that is equally applicable here—the "level of uncertainty is not the same." *Id.; see id.* at 945–48, 951 (concluding that allegations of "other acts" in the underlying action was not an "occurrence" covered by the policy, despite that it was an issue of "first impression" under Hawaii insurance law).

defending.  This is significant because insurers have the right to "limit their liability and to impose whatever conditions they please on their obligation, provided they are not in contravention of statutory inhibitions or public policy." *Dairy Rd.*, 992 P.2d at 106 (brackets omitted) (quoting *First Ins. Co. of Haw., Inc. v. State*, 665 P.2d 648, 655 (Haw. 1983)).  While it is not necessary to this Order to speculate, it seems clear under the terms of the Policy that Westport did just that.

In sum, the Policy unambiguously excludes coverage for, *inter alia*, proceedings seeking "sanctions."  Given the nature of the conduct at issue in the Applications—namely, Damon Key's alleged failure to obey the federal court's Asset Freeze Order—the relief sought by the *Takiguchi* plaintiffs could not have been anything other than sanctions.  Accordingly, Westport had "no obligation to defend."  *Pruett*, 186 P.3d at 623 (citation omitted); *Oahu Transit Servs. v. Northfield Ins. Co.*, 112 P.3d 717, 725 (Haw. 2005) ("Because the allegations contained in the complaint do not even raise the possibility of coverage, [the insurer] owed no duty to defend.").

As a matter of law, Count I is DISMISSED.  Any amendment to the Complaint would be futile because the Policy controls.  *See Johnson*, 793 F.3d at 1007–08.

## II.     Breach of Good Faith & Fair Dealing (Count II)

In Count II, Damon Key asserts that "Westport has breached its duty of good faith and fair dealing by failing to defend Damon Key in connection with the [*Takiguchi* plaintiffs' contempt Applications]." Dkt. No. 1, ¶ 53; *id.* at ¶ 50.

Under Hawaii law, "there is a legal duty, implied in a first- and third-party insurance contract, that the insurer must act in good faith in dealing with its insured, and a breach of that duty of good faith gives rise to an independent tort cause of action." *Best Place v. Penn Am. Ins. Co.*, 920 P.2d 334, 346 (Haw. 1996). The tort of bad faith does "not turn on whether the claim for benefits was due or not; instead, it turn[s] on 'the conduct of the insurance company in handling the claim.'" *Willis v. Swain*, 304 P.3d 619, 632 (Haw. 2013) (quoting *Enoka v. AIG Hawaii Ins. Co.*, 128 P.3d 850, 864 (Haw. 2006)); *Guajardo*, 187 P.3d at 587. Thus, "an action for the tort of 'bad faith' will lie, for example, when an insurance company unreasonably handles or denies payment of a claim." *Francis v. Lee Enters.*, 971 P.2d 707, 711 (Haw. 1999). Here, Damon Key's "bad faith" claim falters.

First, the Complaint is bereft of any allegations regarding Westport's "conduct" in handling Damon Key's claim. Although Damon Key alleges Westport acted with "conscious indifference" and "wanton disregard" in denying the claim, these are conclusory assertions, unadorned with any factual enhancement. *See Iqbal*, 556 U.S. at 678. Damon Key has not pointed to anything Westport did other than

- 22 -

make the allegedly incorrect decision to deny coverage. But "an erroneous decision not to pay a claim for benefits due under a policy" is not enough to sustain a bad faith claim against an insurer. *Best Place*, 920 P.2d at 347.

Second, "*conduct* based on an interpretation of the insurance contract that is *reasonable* does not constitute bad faith." *Guajardo*, 187 P.3d at 587 (emphasis in original) (quoting *Best Place*, 920 P.2d at 347). Having concluded under a "plain language" reading of the Policy that the relevant Policy terms are unambiguous and exclude coverage for the underlying Applications, Westport's interpretation was not only reasonable, it was correct. As such, Damon Key has failed to state a claim for breach of the duty of good faith. Count II is therefore DISMISSED.

Because Damon Key has failed to establish that Westport owed a duty to defend under the Policy or that Westport acted in bad faith in the process of denying Damon Key's claim, Westport's motion to dismiss, Dkt. No. 10, is GRANTED.

## CONCLUSION

For the reasons set forth herein, Defendants' Motion to Dismiss the Complaint, Dkt. No. 10, is GRANTED, and the Complaint, Dkt. No. 1, is DISMISSED WITHOUT LEAVE TO AMEND. Accordingly, Plaintiff's Counter Motion for Partial Summary Judgment, Dkt. No. 17, is DENIED.

The Clerk is instructed to enter Judgment in favor of Defendant Westport Insurance Corporation and close this case.

IT IS SO ORDERED.

DATED: October 10, 2019 at Honolulu, Hawai'i.



_____
Derrick K. Watson
United States District Judge

_____
*Damon Key Leong Kupchak Hastert v Westport Insurance Corporation, et al*; Civil No. 19-00099 DKW KJM; **ORDER (1) GRANTING DEFENDANTS' MOTION TO DISMISS WITHOUT LEAVE TO AMEND; AND (2) DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**